# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| **TARA HUNT O/B/O A. H.** | * | **CIVIL ACTION NO. 05-1407** |
| **VERSUS** | * | **JUDGE MELANÇON** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Tara Hunt filed an application for supplemental security income (SSI) on May 31, 2002,[1] on behalf of her daughter, A. H., born September 21, 1995, based on attention deficit hyperactivity disorder ("ADHD"), with an onset date of January 1, 1999.

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is not substantial evidence in the record to support the Commissioner's decision of non-disability. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

---

[1]Claimant filed a prior application for SSI on November 16, 2000, which was denied after a hearing before an Administrative Law Judge ("ALJ") and not appealed.

In fulfillment of F.R.Civ.P. 52, I find that the Commissioner's findings and conclusions regarding claimant's disability is not supported by substantial evidence, based on the following:

**(1) Records from Creswell Elementary School**.  On September 21, 2001, claimant's special education teacher, Charlotte Guidry, wrote that claimant had screamed, yelled, hit other students, sat in the hall and yelled, hid from her, and "threatened to kill everyone." (Tr. 84).  Ms. Guidry wrote that "I have never seen her this disturbed."

On October 12, 2001, Ms. Guidry wrote that claimant had "serious behavior problems" at school.  (Tr. 85).  She noted that claimant was "frequently uncontrollable," and hit, spit on, and fought with other children.  She reported that claimant kicked the door, desk, and other furniture in the classroom.  She stated that claimant climbed on furniture, tore books, covered her ears and sang while the teacher was speaking, got up in the middle of class, ran around the room, and rolled on the floor.  She observed that claimant could behave well until she was told no, at which time she was nearly impossible to handle.

Claimant also kicked and hit Ms. Guidry, and stuck her tongue out.  Additionally, she ran out of the classroom and out of the school.  Ms. Guidry reported that this behavior occurred three to four times a week.  She stated that claimant had

2

developmental delays, delays in adaptive and academic functioning, and attention deficit disorder.

In the Progress Report for October, 2001 through June 3, 2002, Ms. Guidry stated that claimant continued to have behavior problems. (Tr. 92). She noted that claimant got angry and hit others, talked back to the teacher, cursed, and threw things.

**(2) Individualized Education Program, St. Landry Parish, dated May 17, 2002**. Claimant's strengths were that her vision and hearing were within normal limits. (Tr. 96). She appeared to like school, and attended regularly at times. However, her behavior interfered with her academic performance.

Evaluation results indicated delays in academic and adaptive functioning. Claimant was on about a three year, six month level in kindergarten. Her attention span was very limited, and she had difficulty staying on task. (Tr. 97). She did not always follow rules for classroom behavior. She picked on others, and frequently denied any wrong doing, even when caught in the act. She became angry easily, and threw things and left the classroom. It was recommended that claimant be placed in a self-contained class on regular campus. (Tr. 105).

**(3) Records from Dr. Joseph Henry Tyler, Jr. Mental Health Center dated May 15, 2002**. Claimant was admitted for behavior problems that were getting worse. (Tr. 106). She fought with her sisters, ran out in the street, and acted

impulsively. She had temper tantrums, was aggressive to peers, and cursed peers and adults.

On interview, she sat quietly and refused to talk. Her mother reported that claimant "hollers and yells she'll kill them." She took money out of her mother's purse. She pulled her sisters' hair, bit and spit on them. Her strengths were that she folded clothes well, helped pick up in the yard, and cleaned her room. She played well by herself, but started to fight when she played with others. (Tr. 107).

Claimant's mother reported that claimant was almost two when she walked, and almost three when she talked. (Tr. 106). Claimant was taking Zyrtec, Adderall, and Clonidine. Her mother felt that Adderall was not very effective. However, she also indicated that the medications calmed claimant down. (Tr. 106).

The social worker's impression was rule out ADHD and oppositional defiant disorder. (Tr. 107).

**(4) Letter from Dr. Thomas Jones dated July 15, 2002**. Dr. Jones wrote that he had been treating claimant since January 15, 2001, for ADHD. (Tr. 110). He noted that because of her history of cruelty to animals and her behavior problems at school, he had no doubt that some other behavior problems were evident. (Tr. 111). It was unclear to him whether it would be oppositional defiant disorder or a conduct disorder. He referred her to a mental health unit.

**(5) Consultative Psychological Evaluation by Sandra B. Durdin, Ph.D., dated October 1, 2002**. Dr. Durdin noted that when claimant first entered the room, she acted as if she were completely mute. (Tr. 112). She then began to talk, but was very oppositional and pretended not to know anything. Her mood moved from oppositional to neutral and then almost positive.

Claimant's mother reported that claimant had walked and talked at 10 months. (Tr. 113). She began seeing problems in claimant at age 4 ½, and reported that claimant had been taking medications since age 5. She stated that claimant had to repeat kindergarten. She said that claimant fought with other children, poked them with pencils, and ran into the street when she could not have her way in the classroom. However, she did things whenever she was ready to do them both at home and in the classroom.

Claimant's mother had a bottle of Adderall with an April date, and a bottle of Clonidine dated 9/4/02. Her mother reported that claimant had taken the Clonidine that morning. Claimant was not in a counseling program.

Claimant's teachers told her mother that claimant had good learning ability, but refused to do the work. She had failed kindergarten due to behavioral problems, not mental dullness.

On intelligence testing, claimant obtained a verbal IQ score of 95, performance

of 90 and full scale of 92. She scored within low average to average on both verbal and nonverbal tasks, with predominately average scores. (Tr. 114). Dr. Durdin observed that claimant's effort was reasonable, but suspected that claimant could have done a little better at times. She estimated that claimant's adaptive skills were within average range.

Dr. Durdin did not observe any ADHD symptoms. She noted that claimant was oppositional, and that her teacher had described behaviors which were oppositional and conduct disordered. Her teacher did not indicate that claimant could not sit still or attend in class. Claimant demonstrated that she could understand directions and follow them, was acquiring information and could cooperate if she decided to do so. She was not impulsive in session, but could be in groups. Her teacher described willful disobedience.

Dr. Durdin's impression was oppositional defiant disorder; ADHD, combined type, by history, but not observed, and a history of sinus allergies by report.

**(6) Childhood Disability Evaluation Form dated November 15, 2002**. Jeanne L. George, Ph.D. determined that claimant's impairments of ADHD and ODD were severe, but did not meet, medically equal or functionally equal the listings. (Tr. 116). She determined that claimant had less than marked limitations as to acquiring and using information, and attending and completing tasks. (Tr. 118). She found that

claimant had marked limitations as to interacting and relating with others. She concluded that claimant had no limitations in any other domains. (Tr. 119).

**(7) St. Landry Parish Pupil Appraisal Services Individual Evaluation Integrated Report dated July 12, 2002**. Claimant's teacher reported that claimant still did not recognize most letters of the alphabet in kindergarten. (Tr. 123). She hit other students in class, hollered for no reason, and took things that did not belong to her. She also poked others with tacks and pencils and laughed inappropriately. (Tr. 124). Her grades were poor in all academic areas.

At home, claimant did not listen that well, and punishment was not effective. Her mother reported that claimant broke things when she was angry, and had a habit stealing from home, schools, and stores. She experienced conflicts with other children, as well as her siblings. (Tr. 125). She did play well alone at times. She had a temper, and would leave and go towards the street at times.

Claimant's mother reported that claimant walked at 16 or 17 months of age, and was toilet trained at age 3. She mentioned that claimant was enuretic at night, as well as in the daytime occasionally. Claimant was able to dress herself, do chores, ride a bicycle with training wheels, cut with scissors, and color.

Educational assessment results indicated that claimant was functioning at least one and a half standard deviations below the mean in reading and math. (Tr. 127). In adaptive behavior, she was functioning on about a three year, six month level, which was greater than one and a half standard deviations below the mean. Accordingly, she met the Pupil Appraisal Handbook eligibility guidelines for the classification of developmental delay.

**(8) Claimant's and Claimant's Mother's Administrative Hearing Testimony**. At the hearing on August 27, 2003, claimant was unrepresented. (Tr. 147). Claimant's mother testified that since the last application, claimant was still acting up, and had a bad behavior problem. (Tr. 148). She stated that claimant tore up the room, threw things down, and had tantrums.

Claimant's mother testified that claimant went to the doctor every one to two months. (Tr. 150). She stated that claimant was on Clonidine and Adderall, which helped. (Tr. 151). However, she reported that the Adderall made claimant angry and fight with other children down the street.

Claimant's mother testified that claimant was in special education classes. She said that the teachers stated that claimant was doing a little better. (Tr. 152). However, she reported that claimant was still putting her head down, messing with bigger children, and running out of the class. She stated that claimant had changed

8

schools, but it did not help anything.

Additionally, claimant's mother reported that claimant fought with her sisters and pulled their hair. (Tr. 153). She also stated that claimant was supposed to clean her room and make up her bed, but that she would mess up the room whenever she got mad. She testified that claimant liked to play Old Maid cards and ride a bike. (Tr. 154).

Claimant testified that she was in the second grade. (Tr. 148). She stated that she liked her teacher all right. (Tr. 149). She reported that she helped her mother around the house sometimes. She said that she liked to ride the bike.

**(9) Witness' Administrative Hearing Testimony**. Claimant's grandmother's friend, Marie Aucenne, testified that claimant had pushed her 3-year-old grandson from the top of the staircase to get a toy that she had wanted. (Tr. 155). She stated that afterwards, claimant had broken three of her lamps. She also "threatened to kill us all in the house."

Ms. Aucenne testified that she had witnessed claimant jumping on her youngest sister, and beating her so badly that her mouth bled, leaving a scar. She stated that claimant was "a very angry child." She additionally reported that claimant had threatened to kill her grandmother when she told claimant something. Ms. Aucenne also said that claimant had bitten her dog. (Tr. 156).

**(10) The ALJ's Findings are Entitled to Deference**. Claimant argues that the ALJ erred in failing to properly advise her mother of claimant's right to representation. Because I find that the ALJ erred in finding that claimant was not disabled, I recommend that the Commissioner's decision be **REVERSED,** and that the claimant be awarded benefits.

It is well established that the ALJ owes a duty to a claimant to develop the record fully and fairly to ensure that his decision is an informed decision based on sufficient facts. *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996). When a claimant is not represented by counsel, the ALJ owes a heightened duty to "scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts." *Id.* (citing *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984)). In this case, the ALJ failed to advise claimant's mother of the right to counsel at the hearing. (Tr. 147).

The Commissioner argues that claimant validly waived her right to counsel because she had received several written notices advising her of her right to an attorney at the hearing. (rec. doc. 9, p. 3; Tr. 45, 49-50, 52). In support of this argument, the Commissioner cites *Castillo v. Barnhart*, 325 F.3d 550, 552-53 (5th Cir. 2003), in which the Fifth Circuit concluded that claimant's receipt of numerous written notices of her right to counsel, along with the ALJ's reminder at the hearing of her right to counsel, sufficiently informed her of her right to an attorney such as

to constitute a valid waiver. This case is distinguishable, however, as the ALJ here did not remind claimant's mother of her right to counsel at the hearing. As the ALJ utterly failed to advise claimant's mother of her right to representation, the undersigned finds that any waiver was invalid.

However, to merit reversal of the ALJ's decision, a claimant who does not validly waive her right to counsel must prove that she was thereby prejudiced. *Id.*; *Gullett v. Chater*, 973 F.Supp. 614, 621 (E.D. Texas 1997). To establish prejudice, claimant must show that counsel "could and would have adduced evidence that might have altered the result." *Brock*, 84 F.3d at 728, quoting *Kane*, 731 F.2d at 1220. Claimant argues that she was prejudiced, because had she been represented by counsel, an argument would have been made that the medical and non-medical evidence established that her combination of impairments functionally equaled a listing. (rec. doc. 8, p. 3).

To "functionally equal" the listings, a child's impairment must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). These domains are: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being. § 416.926a(b)(1).

Under the regulations, a "marked" limitation is defined as an impairment which "interferes seriously" with a child's ability to independently initiate, sustain, or complete activities. § 416.926a(e)(2). A child's day-to-day functioning may be seriously limited when her impairment limits only one activity or when the interactive and cumulative effects of her impairment limit several activities. *Id.* A "marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning that the Social Security Administration ("SSA") would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. *Id.*

An "extreme" limitation is defined as an impairment which "interferes very seriously" with a child's ability to independently initiate, sustain, or complete activities. § 416.926a(e)(3). A child's day-to-day functioning may be very seriously limited when her impairment limits only one activity or when the interactive and cumulative effects of her impairment limit several activities. An "extreme" limitation also means a limitation that is "more than marked." *Id.* An "extreme" limitation is the rating that is given to the worst limitations. *Id.* However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. *Id.* It is the equivalent of the functioning that the SSA would expect to find on standardized testing with scores that are at least three standard deviations below the mean. *Id.*

The ALJ determined that claimant had severe impairments of ADHD and oppositional defiant disorder, but that these impairments did not meet or equal the listings. (Tr. 23-24). He then evaluated her impairments for functional equivalence, finding that she had less than marked limitations as to acquiring and using information and attending and completing tasks, a marked limitation as to interacting and relating with others, and no limitations in the other domains. (Tr. 25-26). Claimant argues that the ALJ erred in failing to find that she had an extreme limitation as to interacting and relating with others, as well as marked limitations as to acquiring and using information and attending and completing tasks. (rec. doc. 8, pp. 6-7).

In the domain of interacting and relating with others, the Social Security Administration considers how well a child initiates and sustains emotional connections with others, develops and uses the language of her community, cooperates with others, complies with rules, responds to criticism, and respects and takes care of the possessions of others. 20 C.F.R. § 416.926a(i). The ALJ noted that claimant mocked the teacher's aide, refused to complete assignments, argued with classmates, called her classmates names, made obscene gestures with her hands, was violent towards other students, and created disturbances. (Tr. 26). Additionally, he observed that she fought with her siblings other children, and had a history of cruelty

to animals. The ALJ also acknowledged that claimant had refused to talk with the clinical social worker at Tyler Mental Health Clinic and had initially refused to talk at her psychological evaluation with Dr. Durdin. However, the ALJ further noted that during Dr. Durdin's examination, claimant moved from oppositional to neutral to almost positive.

The ALJ also noted Dr. Durdin's opinion that claimant could cooperate "if she decides to do so." (Tr. 114). However, relying on a single meeting with Dr. Durdin is insufficient to overcome the other medical records showing that claimant had ADHD and oppositional defiant disorder. (Tr. 107, 110-11). The ALJ's saying that claimant could control her behavior ignores the diagnosis of ODD, which is supported by the medical evidence, including Dr. Durdin's report. (Tr. 114). If this claimant does not have an "extreme" limitation in interacting and relating to others, I do not think that an extreme one exists. I believe that the ALJ's finding that claimant has a marked rather than an extreme limitation based on Dr. Durdin's opinion that claimant could control her behavior is untenable in light of the overwhelming evidence of ODD.

Additionally, even if claimant had a marked limitation in that domain, the evidence at this point shows that claimant also has a marked limitation as to acquiring and using information. This domain focuses on how well a child acquires or learns

14

information, and how well she uses the information she has learned. 20 C.F.R. § 416.926a(g). Claimant argues that she has a marked limitation in this domain, as she had failed kindergarten, was unable to recognize letters of the alphabet, and could not count or write to 10 at almost 6 years of age. (rec. doc. 8, p. 6; tr.123-27). She further asserts that she was functioning at least one and a half standard deviations below the mean in reading and math, and that her adaptive behavior was greater than one and a half standard deviations below the mean. (Tr. 127).

The ALJ relied on Dr. Durdin's opinion that claimant had failed kindergarten due to behavioral problems, not mental dullness. (Tr. 113). She further found that claimant's level of intellectual functioning was within average limits, with IQ scores ranging from 90 to 95. (Tr. 113). She also suspected that claimant "could have done a little better at times."

While claimant does have IQ scores ranging from 90 to 95, which is in the average range, this does not support a finding that she has a less than marked limitation as to acquiring and using information. When combining claimant's academic achievement with her behavioral problems, I do not believe that you can rely on her test scores alone. Even Dr. Durdin noted that claimant had failed kindergarten due to her behavioral problems. This suggests that, even with claimant's average intelligence, her behavior interferes with her academic achievement. Thus,

I find that the ALJ erred in finding that did not have a marked limitation in this domain.

Under these circumstances of an invalid waiver and claimant's behavioral problems, I cannot affirm the ALJ's decision. Accordingly, I recommend that the Commissioner's decision be **REVERSED**, and that the claimant be awarded appropriate benefits. The undersigned recommends that on May 31, 2002, which is the onset date asserted in the application, be used as the date for the commencement of benefits.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have ten (10) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within ten (10) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN TEN (10) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN**

**AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.** *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, **79 F.3D 1415 (5TH CIR. 1996).**

Signed this 7th day of June, 2006, at Lafayette, Louisiana.

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE